IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

NO. 2:23-CV-65-FL

| | | |
|---|---|---|
| LEGACY SPENCER, as the Administrator for the Estate of Sylvester Demetrius Selby, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| EDWARD GLASER, III, in his individual capacity, and SHERIFF DOUG DOUGHTIE, in his official capacity, | ) ) ) ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion to dismiss for failure to state a claim (DE 55) and plaintiff's motion to lift stay and proceed to discovery (DE 61). The motions have been briefed fully, and in this posture the issues raised are ripe for ruling. For the following reasons, defendants' motion is granted, and plaintiff's motion is terminated as moot.

**STATEMENT OF THE CASE**

Plaintiff commenced this civil rights action December 7, 2023. In operative second amended complaint filed August 28, 2024, plaintiff claims against defendant Edward Glaser III ("Glaser") under 42 U.S.C. § 1983 for unlawful and excessive force in violation of the Fourth Amendment. State law claims for assault, battery, and wrongful death also are alleged against defendant Glaser, in his individual capacity, and defendant Sheriff Doug Doughtie ("Doughtie"), in his official capacity. Plaintiff seeks compensatory and punitive damages, as well as costs, fees, and expenses.

Procedural history pertinent to the instant motions may be summarized as follows. On March 6, 2024, defendants filed motion to dismiss, arguing the factual allegations fail to state a plausible claim for relief, and otherwise are contradicted by officer body camera videos. Hearing on this motion, together with other matters, was held March 13, 2024. The next day, the court entered an order ruling as follows: 1) accepting the body camera videos into the record as exhibit to the motion to dismiss;[1] 2) memorializing the parties' agreement that any allowed amendment to the complaint would moot then pending motion to dismiss; and 3) and granting defendants' motion to stay discovery pending ruling on the motion to dismiss or contemplated motion to amend, "subject to later review." (Order (DE 37) at 3). Plaintiff then filed a motion to amend the complaint May 17, 2024, and the court entered order August 28, 2024, granting this motion, and terminating as moot defendant's prior motion to dismiss. See Spencer v. Glaser, No. 2:23-CV-65-FL, 2024 WL 3969415, at *4 (E.D.N.C. Aug. 28, 2024). Plaintiff thereafter filed the operative amended complaint August 28, 2024, as noted above.

Defendants filed the instant motion to dismiss September 13, 2024, seeking dismissal of all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6), with reference to the body camera videos. Plaintiff responded in opposition, and defendants replied. Thereafter,

---

[1] Defendants filed notice of manual filing of the body camera videos on February 21, 2024. The court thereafter received a flash drive containing the following six .mp4 files: 1) "EdwardGlaser_202310022336 _WFC1131995_76301061" (showing body cam video of defendant Glaser during the incident at issue in this case, hereinafter, the "Glaser video"), duration 34:38; 2) "DuWayneGibbs_202310022336 _WFC1114084_152942740" (showing body cam video of officer DuWayne Gibbs, hereinafter, the "Gibbs video"), duration 01:26:42; 3) "1 EdwardGlaser_202308260327 _2157_392995438" (showing footage inside a police vehicle while driving and stopped, including audio of discussions with Emergency Medical Services, officers, and unidentified person near the residence), duration 35:40; 4) "EdwardGlaser_202308260327 _2157_392995438" (showing footage inside the rear interior of a police vehicle), duration 35:40; 5) "DuWayneGibbs_202310030102_WFC1131976_75842608" (showing Gibbs's post-incident video), duration 01:41:06; and 6) 1 DuWayneGibbs_202310030102_WFC1131976_75842608, (duplicate of Gibbs's post-incident video), duration 01:41:06. The court relies, in part, on the body camera videos, as detailed herein, for purposes of the instant motion to dismiss.

2

plaintiff filed the instant motion to lift stay and proceed to discovery to which defendants responded in opposition.

## STATEMENT OF FACTS

Plaintiff is administrator for the estate of Sylvester Demetrius Selby ("Selby"), who was a resident of Manteo, North Carolina. The facts viewed in the light most favorable to plaintiff, as set forth in complaint[2] and in the body camera videos,[3] may be summarized as follows.

"On October 2, 2023, at approximately 11:30 p.m., John Sims ["Sims"] called 911 requesting medical assistance" for Selby. (Compl. ¶ 7). "At the time of the 911 call, both [] Sims and [] Selby were at [] Selby's family home,[4] which is located at 1372 Burnside Road, Manteo, NC." (the "residence"). (Id. ¶ 7). Dare County Sheriff's Office deputies DuWayne Gibbs ("Gibbs") and defendant Glaser "were dispatched to the scene." (Id. ¶ 8).

Upon arrival, Gibbs advanced walking through darkness toward the residence, with his flashlight pointed ahead at a trailer the door of which visibly was ajar, illuminated partially by a porch light. (Gibbs video 0:00:00-0:00:05).[5] He approached Sims, who was sitting on a utility

---

[2] Hereinafter, all references to the "complaint" and "Compl." in citations are to the operative second amended complaint (DE 53).

[3] The court cites to the body camera videos when they "clearly depict[] a set of facts contrary to those alleged in the complaint, or blatantly contradict[] the plaintiff's allegations." Doriety for Est. of Crenshaw v. Sletten, 109 F.4th 670, 679–80 (4th Cir. 2024) (internal quotations omitted). Time citations refer to elapsed time when played in Microsoft Media Player version 11.2410.8.0.

[4] In contrast to this allegation, a 911 transcript in the record suggests the residence is associated with Sims. (911 transcript (DE 33-4) ("DISPATCHER - Is somebody at your house that doesn't belong there. CALLER - He [wasn't] supposed to be here . . . he's been told not to come here.")). Body camera videos also corroborates this characterization, including Sims' statement that Selby was "not allowed to come here because he throws [] spasms" (Gibbs video 0:00:09-0:00:27). Nevertheless, for purposes of this allegation in the complaint, the court accepts plaintiff's version as true, because it is not "blatantly contradict[ed]" by the body camera videos. Doriety, 109 F.4th at 680.

[5] The court cites to the body camera video here because it "clearly depicts a set of facts contrary to those alleged in the complaint." Doriety, 109 F.4th at 679-680; Compare Compl. ¶ 9 (alleging that "Upon arriving to the residence" officers first ordered Selby to "exit the residence") with (Gibbs video 0:00:06-0:00:35) (showing officers first spoke with Sims). Other video citations similarly contradict allegations in the complaint.

3

trailer next to the residence, and asked, "Is he in the house? What's he doing in the house?" (Id. at 0:00:06-0:00:08). Sims responded, "[inaudible] Going crazy, he wanted to [inaudible], but he's not allowed to come here because he throws those spasms." (Id. at 0:00:09-0:00:27). Gibbs then asked, "Are there any weapons in the house or anything?" (Id. at 0:00:28-0:00:30). Sims responded, "No, I'm sorry [inaudible] I opened the door." (Id. at 0:00:31-0:00:34).

As Gibbs walked toward the stairs and asked, "Where is he at in the house?" (id. at 0:00:34-0:00:35), defendant Glaser stood in proximity to Sims, who said, "I wouldn't let him in the house" (Glaser video 0:00:11-0:00:12). Gibbs repeatedly called out to Selby, urging him to exit the residence with commands like "Hey Demetri" (Glaser video 0:00:12-0:00:13; Gibbs video 0:00:36-0:00:37, 0:00:40-0:00:41), "Come here buddy" (Glaser video 0:00:14-0:00:15, 0:00:20-0:00:21; Gibbs video 0:00:42-0:00:43, 0:00:48-0:00:49), and "Demetri" (Glaser video 0:00:31-0:00:32; Gibbs video 0:00:59-0:01:00).

Selby "complied with [the] command[s]" and stepped onto the porch, illuminated by the porch light. (Compl. ¶ 10). Gibbs saw "Selby holding a kitchen knife in one hand and an apple[6] in the other . . . in a non-threatening manner," while "blood [was] dripping from [] Selby's chest." (Compl. ¶ 10; see Glaser video 0:00:39-0:00:40; Gibbs video 0:01:08-0:01:09). Gibbs "unholster[ed] his [] weapon" (Compl. ¶ 9), and urged Selby, "Come here buddy, how are you doing? Hey, could you put the knife down for me?" (Glaser video 0:00:40-0:00:43; Gibbs video 0:01:09-0:01:12). Selby responded affirmatively (Compl. ¶ 11) but instantly moved forward on the small porch with the knife (Glaser video 0:00:44; Gibbs video 0:01:13), as Gibbs shone his flashlight and commanded, "Hey, stop right there." (Id.).

---

[6] The body camera recordings show that Selby moved erratically, holding a sphere-shaped object, the nature of which is unclear in the video and may not have been apparent to officers in the seconds before he ran down the steps.

"Defendant Glaser then gave another verbal command to drop the knife," (Compl. ¶ 12; see Glaser video 0:00:45; Gibbs video 0:01:14), but Selby continued rapidly down the porch steps, knife in hand, closing within feet of Gibbs, (Glaser video 0:00:43-0:00:45; Gibbs video 0:01:12-0:01:14), who stumbled as he retreated, causing his flashlight to shift (Gibbs video 0:01:14–0:01:16).

Seconds after issuing his last command, defendant Glaser fired his weapon, causing his flashlight to briefly shift. (See Compl. ¶ 12; Glaser video 0:00:45–0:00:47). Selby was struck by this first round from defendant Glaser, stumbled over a bicycle near the steps, and fell onto his back near the bottom of the steps, dislodging both the knife and the apple. (See Compl. ¶ 13; Glaser video 0:00:45–0:00:47).

"While on the ground and on his back, [] Selby frantically flail[ed] his hands and legs in the air while sliding on his back for approximately 12 seconds." (Compl. ¶ 14; see Glaser video 0:00:47-0:00:59; Gibbs video 0:01:16-0:01:28). "For the entire 12 seconds, while [] Selby was on the ground on his back and frantically flailing his hands and legs in the air, it was . . . clear that [] Selby was no longer in possession of the kitchen knife or apple." (Compl. ¶ 15; Glaser video 0:00:47-0:00:59; Gibbs video 0:01:16-0:01:28). Throughout this brief 12-second period, "Sims [repeatedly] pleaded [with d]efendant Glaser not to shoot [] Selby . . . [who] was on his back[,] frantically flailing his hands and legs in the air." (See id.). During this 12-second window, defendant Glaser ordered Sims to "get away from [Selby]" (Glaser video at 0:00:54-0:00:55) and stumbled while retreating, causing his flashlight to shake and briefly go dark, leaving them in momentary darkness. (Glaser video 0:00:53-0:00:54, 0:00:58-0:00:59).

After defendant Glaser refocused his flashlight, both Sims and Selby ignored his commands to stop and continued to advance in unison. (Id. at 0:00:55–0:00:57, 0:00:59–0:01:00).

5

Defendant Glaser ordered Selby to "stay down" while stumbling during his retreat (Glaser video 0:00:55-0:01:01). Although Selby was not "able to gain his footing" (Compl. ¶ 19), he "readjust[ed] his body whereby his hands and knees were on the ground" (id. at. ¶ 16) and advanced rapidly toward defendant Glaser and Gibbs on all fours (Glaser video 0:01:00-0:01:01; Gibbs video 0:01:28-0:01:29). As Selby continued forward, "attempt[ing] to run in between [the officers]" (see Compl. ¶ 18; Glaser video 0:01:00-0:01:01), Gibbs commanded "Demetri, stop!" (Gibbs video 0:01:28-0:01:29).

Defendant Glaser then fired two more shots, striking Selby just feet away (see Compl. ¶¶ 17-19; Glaser video 0:01:00-0:01:01). Selby fell again to the ground, twisting and flailing erratically, as Gibbs continued ordering him to stop moving (see Compl. ¶ 20; Glaser video 0:01:07-0:01:09; Gibbs video 0:01:36-0:01:38). Once Selby stopped, defendant Glaser told Sims to "back up" (Glaser video 0:01:14-0:01:15) and checked Selby's vitals (id. at 0:01:22-0:01:23). Defendant Glaser encouraged Selby to "breathe, buddy; breathe; breathe" (id. at 0:01:33-0:01:38), while Gibbs told him to "hang in there for me" and called for emergency medical services.[7] (Gibbs video 0:02:39-0:02:46). "[Selby] could be heard gargling off his own blood and gasping for air for several minutes before he died on the scene."[8] (Compl. ¶ 20).

---

[7] Gibbs's body camera captured his report thereafter to dispatch: "We responded to a trespassing in progress (Gibbs video 0:06:14-0:06:16), "Demetrius Selby was 1073" (id. at 0:06:17-0:06:19) (referring to a law enforcement or medical designation for mental health status, suggesting the individual may be experiencing issues that could pose a potential threat). "I asked him to come out of the house, he had a knife in his hand, he ran off the porch at me, and Glaser shot him" (id. at 0:06:11–0:06:27), "Yeah, three times (id. at 0:06:29–0:06:30). I was tripping over a [utility] trailer out front, trying to get my bearings to get away [from Selby], and Glaser had to do it" (id. at 0:06:46–0:06:55), "Honestly, I was trying to back up as fast as I could" (id. at 0:06:59–0:07:02), "and so Glaser responded well" (id. at 0:07:03–0:07:05).

[8] Plaintiff claims that Selby died because of gunshot wounds inflicted by defendant Glaser. (See Compl. ¶ 18). However, the state medical examiner's findings contradict this allegation, concluding that Selby, who had ingested cocaine, methamphetamine, alcohol, and other substances, died from a stab wound to the chest sustained before the officers arrived. (Autopsy (DE 51-1)) (identifying the cause of death as a stab wound to the anterior left chest and reporting toxicology results from chest blood positive for alprazolam, amphetamine, benzoylecgonine, cocaine, alcohol, and methamphetamine). Although the autopsy findings conflict with plaintiff's allegations, the court accepts plaintiff's version as true for the purposes of this motion. The discrepancy does not affect the analysis.

**COURT'S DISCUSSION**

A.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[9] "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

B.    Analysis

    1.    Fourth Amendment Claims

"[A]ll claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989); Hupp v. Cook, 931 F.3d 307, 321 (4th Cir. 2019) (permitting only force that is "reasonable under the circumstances"). "The reasonableness of . . . force must be judged from the perspective of a reasonable officer on the scene, rather than with the [benefit] of hindsight." Graham, 490 U.S. at 396; see also Kingsley v. Hendrickson, 576 U.S. 389, 399, (2015)

---

[9]    Internal citations and quotation marks are omitted from all citations unless otherwise specified.

7

(reasonableness must be judged "from the perspective and with the knowledge of the defendant officer.").

"The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996). "[P]roper application [of this standard] requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect] actively resist[ed] arrest or attempt[ed] to evade arrest by flight." Graham, 490 U.S. at 396; Kingsley, 576 U.S. at 397. Other relevant factors include "[t]he relationship between the need for [] force and the amount [] used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." Kingsley, 576 U.S. at 397. However, "subjective factors involving [the officer's] motives [or] intent are not relevant." See Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994).

When deadly force is involved, the inquiry focuses on the precise "moment" it was employed. Saucier v. Katz, 533 U.S. 194, 207 (2001) ("Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred"), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223 (2009); Elliott, 99 F.3d at 643-44 (analyzing whether suspect was "threatening" officers' lives). The "objective reasonableness standard" requires liability to be determined based solely on the information the officers had "immediately prior to and at the very moment [they] fired the fatal shot[s]." Greenidge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991). Notably, "an officer's use of deadly force in response

8

to an obvious, serious and immediate threat to his safety is not excessive." Rambert v. City of Greenville, 107 F.4th 388, 400 (4th Cir. 2024).

The court applies these standards to the first shot and the second and third shots fired by defendant Glaser, as discussed below.

    a.    First Shot

The first shot fired by defendant Glaser was not unreasonable in light of the following undisputed circumstances showing an "obvious, serious and immediate threat to [the] safety" of defendant Glaser and Gibbs. Rambert, 107 F.4th at 400. After Gibbs instructed Selby to exit the residence, Selby emerged holding a knife. (Compl. ¶ 10; see Glaser video 0:00:39–0:00:40; Gibbs video 0:01:08–0:01:09). Almost immediately after being instructed to drop the knife, he defied that command and charged down the steps toward Gibbs at high speed. (Glaser video 0:00:43–0:00:45; Gibbs video 0:01:12–0:01:14). Amid dark surroundings and low visibility, Selby's aggressive, knife-wielding advance toward Gibbs (id.), coupled with his refusal to comply with repeated commands to stop and drop the knife (Glaser video 0:00:42, 0:00:44, 0:00:45; Gibbs video 0:01:11, 0:01:13, 0:01:14), created an immediate threat. In these rapidly developing and dangerous circumstances, defendant Glaser's use of force in firing the first shot was justified. Graham, 490 U.S. at 395.

In Greenidge, 927 F.2d at 792, the United States Court of Appeals for the Fourth Circuit upheld application of deadly force where officers had a "reasonable fear of imminent harm," a principle supported by Rowland, 41 F.3d at 173, which also affirms the use of force when officers reasonably believe they or others are in imminent danger. Defendant Glaser's use of force, given the immediate threat to Gibbs, aligns with these principles. See also Kingsley, 576 U.S. at 399

9

Case 2:23-cv-00065-FL Document 64 Filed 03/21/25 Page 9 of 17

(emphasizing rapidly changing circumstances). Accordingly, defendant Glaser's actions did not violate the Fourth Amendment.

Plaintiff argues that Selby "did not pose [a] threat," claiming he "complied with Deputy Gibbs's [stet] command and exited the home," that his "hands were slightly above shoulder level for an instant [while] skip[ping] down the steps toward [the officers]," and that Gibbs "could see blood dripping from Selby's chest" from a stab wound,[10] and "unholstered his weapon," yet defendant Glaser fired "within seconds" of ordering Selby to drop the knife. (Compl. at ¶¶ 9-12). However, these assertions fail to address the totality of circumstances that shaped defendant Glaser's response.

Selby's alleged compliance is contradicted by his erratic, armed advance despite repeated commands to stop; his prior injury suggests he may have recently engaged in conflict, heightening the unpredictability of his actions; and his proximity to Gibbs in low visibility raises concerns about the potential to seize his unholstered weapon. Taken together, these factors escalate the danger, intensifying the threat posed by Selby's actions. See Rambert, 107 F.4th at 401 (upholding the use of force when suspect ignored commands and aggressively advanced in proximity to officer).

The proximity, rapid advance, and Gibbs's stumble also created an immediate threat, leaving defendant Glaser no time to delay his actions. Like in Elliott, 99 F.3d at 643, the danger unfolded in seconds. Defendant Glaser fired after Selby ignored multiple commands and closed the distance to Gibbs at the bottom of the stairs. (Glaser video 0:00:43-0:00:45; Gibbs video

---

[10] Plaintiff asserts that Selby "was suffering from a stab wound to the heart" (Compl. ¶ 9), but the 911 transcript and body-cam footage make no mention of this injury. The stab wound was later listed on Selby's death certificate (DE 30-2) and in the autopsy report (DE 51-1), but it does not appear to have been disclosed to officers before Selby's death. The discrepancy does not affect the analysis.

10

0:01:12-0:01:14).  Defendant Glaser's split-second decision to fire a single shot to protect his fellow officer thus was reasonable.  (Glaser video 0:00:45; Gibbs video 0:01:14).  Courts have long held that officers need not wait for harm to fully materialize before acting to protect themselves or others.  Elliott, 99 F.3d at 643-44 (upholding deadly force where officers reasonably perceived a serious threat).

Accordingly, plaintiff fails to state a claim for unlawful or excessive force based upon the first shot.

        b.    Second and Third Shots

The second and third shots fired by defendant Glaser also were not unreasonable considering the circumstances of the first shot that preceded them, as well as the following additional rapidly evolving circumstances: After the first shot, Gibbs's flashlight shifted when he tripped, and defendant Glaser's flashlight briefly went dark.  (Glaser video 0:00:45–0:00:47; Gibbs video 0:01:14-0:1:16).  In this brief period of darkness, Selby, previously armed with a knife, continued dragging himself toward defendants Glaser and Gibbs, with Sims advancing in unison (Glaser video 0:00:47-0:00:59), despite defendant Glaser's command to Sims to move away from Selby (id. at 0:00:54-0:00:55).  Sims's "Don't shoot" statements (Compl. at ¶ 15) heighten the threat, as they were contradicted by their continued advance in unison, despite multiple commands to stop.  (Glaser video 0:00:47-0:00:59).  This created uncertainty about whether they were armed.  Further, as defendant Glaser stumbled multiple times while retreating, causing his flashlight to briefly go dark (Glaser video 0:00:45-0:00:47, 0:00:53-0:00:54, 0:00:58-0:00:59), the light refocused to reveal Selby inching forward on his back before abruptly leaping up and advancing in a quadrupedal manner, disregarding commands to stop (see Compl. ¶¶ 17-19; see also Glaser video 0:00:58-0:00:59 ("stop moving" then "stay down"); Gibbs video 0:01:28-0:01:29 ("Demetri,

11

stop!")). In the darkness, the uneven terrain caused defendants Glaser and Gibbs to lose footing and stumble as they attempted to retreat, with Gibbs further hindered by being blocked by the utility trailer, limiting his options for retreat. (Glaser video 0:00:47–0:01:00; Gibbs video 0:01:16–0:01:29). Combined with the potential for Selby or Sims to lunge for weapons, the threat to their safety intensified in these volatile circumstances. (Id.).

Thus, defendant Glaser's second and third shots were objectively reasonable under the Fourth Amendment.

Plaintiff alleges that Selby was unarmed, attempting to flee, "never able to gain his footing" (Compl. ¶¶ 17-19), and that the bullets entered his body "from back to front." (Compl. ¶ 21). These allegations, however, do not undermine the reasonableness of defendant Glaser's split-second decision to act against the immediate threat posed by Selby's renewed aggressive advance, repeated noncompliance, and potential to seize a weapon — especially given defendant Glaser's inability to discern Selby's intentions as he lunged toward defendant Glaser and Gibbs in close proximity. See Rambert, 107 F.4th at 399-400 (upholding reasonableness of application of deadly force against an advancing unarmed suspect).

In Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001), application of deadly force by officers was upheld based on tense, uncertain, and rapidly evolving circumstances, which are similarly present here. See id. at 130; see also Graham, 490 U.S. at 396 (affirming the reasonableness of split-second decisions in high-pressure situations). Despite defendant Glaser's commands for Sims to step back and both Selby and Sims to stop moving (Glaser video 0:00:54-0:01:00), they ignored him. Thus, regardless of Selby's body position or bullet trajectory, the combination of circumstances presenting a substantial and sudden risk to officer safety justified defendant Glaser's actions.

This determination is bolstered by recognition that reasonable perceptions of a threat can justify deadly force, even if later determined that the suspect was unarmed, or the threat misinterpreted. Anderson, 247 F.3d at 130 (radio mistaken for a weapon); McLenagan v. Karnes, 27 F.3d 1002, 1007-08 (4th Cir. 1994) (bystander running toward an officer amid warnings of an armed suspect nearby); Slattery v. Rizzo, 939 F.2d 213, 216–17 (4th Cir. 1991) (uncertain weapon concealment); Greenidge, 927 F.2d at 791–92 (threatening movements). Here, defendant Glaser reasonably perceived a threat due to Selby's initial possession of a knife, defiance of commands, and continuing advances towards defendant Glaser and Gibbs, regardless of whether Selby was in fact unarmed at the time of the second and third shots. Accordingly, plaintiff fails to state a claim for unlawful or excessive force with respect to the second and third shots.

In sum, plaintiff's arguments do not diminish the reasonableness of defendant Glaser's actions. As such, plaintiff's Fourth Amendment claims for unlawful and excessive force are dismissed for failure to state a claim.

2. Qualified Immunity

Qualified immunity protects government officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Iko v. Shreve, 535 F.3d 225, 237 (4th Cir. 2008). The qualified immunity analysis proceeds in two steps, which the court "may address in whichever sequence will best facilitate the fair and efficient disposition of the case." Pfaller v. Amonette, 55 F.4th 436, 444 (4th Cir. 2022). First, the plaintiff must show a violation of a constitutional right. Id.; Stanton v. Elliot, 25 F.4th 227, 233 (4th Cir. 2022). Second,

defendants bear the burden of showing the right at issue was not "clearly established" at the time of the alleged misconduct. Pearson, 555 U.S. at 231; Stanton, 25 F.4th at 233.

Plaintiff fails to meet the first prong necessary to overcome defendant Glaser's qualified immunity defense, as discussed above. In addition, and in the alternative, defendant Glaser has shown that he did not violate a right that was clearly established at the time of the challenged conduct. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 170 (4th Cir. 2016). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018). This "do[es] not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).

Far from suggesting that defendant Glaser violated clearly established law, circuit precedent confirms that the use of force by an officer confronted with a suspect advancing in defiance of commands is justified. In Sigman v. Town of Chapel Hill, 161 F.3d 782 (4th Cir. 1998), the Fourth Circuit granted qualified immunity to an officer, despite conflicting evidence about whether the suspect was still holding a knife as he advanced toward the officers. Id. at 788. The court found that in volatile situations involving a potentially armed suspect, an officer's split-second decision to fire is reasonable, even amid uncertainty. Id. This same reasoning supports the appropriateness of qualified immunity for defendant Glaser.

Similarly, in Rambert, 107 F.4th at 401, the court found that an officer reasonably perceived an ongoing threat when a suspect, despite being shot already multiple times and unable

14

to rise to his feet, ignored commands and continued advancing. In this case, defendant Glaser faced a comparable, volatile situation: in complete darkness, Selby, who had previously possessed a knife, was on the ground moving toward the officers, with Sims walking beside him, both disregarding commands and advancing to within a few feet. This volatile and continuing threat justified the use of deadly force.

Plaintiff relies on Tennessee v. Garner, 471 U.S. 1 (1985) and Graham v. Connor, 490 U.S. 386 (1989), but neither case clearly establishes that defendant Glaser's actions violated the Fourth Amendment under the circumstances here. In Garner, the suspect was unarmed and fleeing, posing no immediate threat, unlike Selby, who advanced on officers with a knife, ignored commands, and continued to pose a danger even after being shot. Graham requires an assessment of force from the perspective of a reasonable officer on the scene. Selby's erratic behavior, the darkness, and the officers' difficulty retreating created a volatile and immediate threat justifying defendant Glaser's actions. As such, defendant Glaser has shown that the right at issue was not "clearly established" at the time. See Pearson, 555 U.S. at 231; Stanton, 25 F.4th at 233.

As a result, defendant Glaser is entitled to qualified immunity, and the court dismisses the claims against him on this alternative ground.

3.  State Law Claims

The court next addresses plaintiff's state law claims brought against defendants Glaser and Doughtie for assault, battery, and intentional wrongful death. (Compl. ¶¶ 57-69). Defendants argue that these claims fail, as the state law claims mirror their federal counterparts and are barred by public official immunity. The court agrees.

Under North Carolina law's public official immunity doctrine, a public official is immune from suit unless the challenged action was outside the scope of official authority, done with malice,

or corrupt.  Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003).  Even if an officer's use of force is mistaken or negligent, the officer is immune unless one of the three exceptions to immunity applies.  Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013).  Plaintiff concedes that defendant Glaser acted within the scope of his duties and does not allege corruption; therefore, defendant Glaser is only liable if he acted maliciously.

Malice requires conduct so contrary to duty that a reasonable person would recognize it as unlawful.  Cooper, 735 F.3d at 160.  Here, defendant Glaser's actions were driven by the need for immediate response to an escalating threat, and his quick, objectively reasonable decisions show no malice.  Less than a minute after shooting Selby, defendant Glaser's body camera footage shows him responding to Sims's question about why he shot by saying, "[h]e had a knife and was coming at us" (Glaser video 0:02:08-0:02:11), a present sense impression that further supports his actions were in self-defense, not with malice.  For the same reasons as the federal qualified immunity defense above, no reasonable person would deem his actions unlawful.  See Cooper, 735 F.3d at 160.  Accordingly, the court finds he is entitled to public officer immunity.

Plaintiff's claims against defendant Doughtie, based on his role as defendant Glaser's employer, fail as well.  In Sigman, 161 F.3d at 789, the court held that the officer's objectively reasonable actions shielded the town from liability.  Similarly, defendant Glaser's reasonable actions shield defendant Doughtie from liability for assault, battery, and wrongful death.

**CONCLUSION**

Based on the foregoing, defendants' motion to dismiss (DE 55) is GRANTED, and all claims against them are DISMISSED for failure to state a claim upon which relief can be granted.  As a result, the court TERMINATES as moot plaintiff's motion to lift stay (DE 61).  The clerk is DIRECTED to close the case.

SO ORDERED, this the 21st day of March, 2025.

_____
LOUISE W. FLANAGAN
United States District Judge

17